**OTTER OIL COMPANY,**
Plaintiff-Appellant,

v.

**EXXON COMPANY, U.S.A.,**
Defendant-Appellee.

No. 87–4022.

United States Court of Appeals,
Fifth Circuit.

Dec. 30, 1987.
Rehearing Denied Feb. 9, 1988.

William J. Friedman, Jr., H. Lee Leonard, Lafayette, La., for plaintiff-appellant.

Mary Anna Robinson, John M. Roper, New Orleans, La., for defendant-appellee.

Before BROWN, POLITZ, and JOLLY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case arises from a transaction or series of transactions among appellant Otter Oil Company (Otter), appellee Exxon Company, U.S.A. (Exxon), and a third entity, Crosby Chemicals, Inc. (Crosby). Their course of dealings is set out in a series of separate writings. The particular documents at issue in this case are: (i) a letter from Otter to Exxon dated December 20, 1983 (the "Letter Agreement"[1], and (ii) a

1. The substantive provisions of the Letter Agreement are as follows. Numbers in brackets ( [1], [2], etc.) are added for ease of reference.

    [1] Contemporaneously herewith Otter and Exxon have entered into an assignment of Otter's interest in a Geophysical Option Agreement by and between Crosby Chemicals, Inc. and Otter Oil Company dated the

20th day of December, 1983 covering 42,-000.98 acres in Allen, Beauregard and Vernon Parishes, Louisiana. Pursuant to said assignment Exxon has agreed to comply with the terms and conditions of said Geophysical Option Agreement.

    [2] The consideration that Otter shall receive and Exxon shall pay for said assignment

document headed "Geophysical Option Agreement" made between Crosby and Otter and also dated December 20, 1983.[2]

### Let's Make a Deal

In the Geophysical Option Agreement, Otter obtained from Crosby a license to conduct geophysical and other types of surveys upon 42,000 acres of land owned by Crosby in an effort to ascertain the presence of oil and gas. That license contained

> will be paid contemporaneously with the execution of the assignment for the initial transfer of Otter Oil Company's interest therein. At that time Otter shall receive from Exxon the sum of $766,517.88.
>
> [3][a] If Exxon Corporation exercises the Geophysical Option Agreement and selects acreage for lease, Exxon Corporation agrees to and does hereby obligate itself to pay to Otter Oil Company the difference between the sums due Crosby Chemicals, Inc. for the bonus and rentals on the dates same become due pursuant to the terms of the mineral lease and supplement thereto attached to the Geophysical Option Agreement and the following amounts:
>
> | [b] Acreage Selected | Selection Bonus/Acre | Rental/Acre |
> | --- | --- | --- |
> | 10,001—15,000 | $90.00 | $45.00 |
> | 15,001—20,000 | $80.00 | $45.00 |
> | 20,001—25,000 | $75.00 | $45.00 |
> | 20,001+ | $70.00 | $45.00 |
>
> [4] If a selection is made by Exxon Corporation pursuant to the Geophysical Option Agreement Exxon shall assign a 2% of 8/8 overriding royalty interest to Otter Oil Company on all acreage selected. The assignment of the overriding royalty interest shall have the terms and conditions and shall be transferred on the form attached hereto.
>
> [5] In the event that Exxon Corporation, its successors or assigns, secures an extension, correction or renewal of the Geophysical Option Agreement or acquires an Oil, Gas and Mineral Lease on the properties described therein prior to the termination of said Geophysical Option Agreement or acquires an Oil, Gas and Mineral Lease within one (1) year after the termination of said Geophysical Option Agreement, or if Exxon Corporation, its successors or assigns, secures a new lease covering any or all lands described in the Geophysical Option Agreement within one (1) year thereafter, *then the obligations, duties and rights set forth herein shall apply to such extension, renewal or new lease and the payments and overriding royalty interest referred to herein shall apply to said extension, renewal or new lease.*

(emphasis added).

an express option to permit Otter to obtain from Crosby within 270 days an oil and gas lease on all or some of those 42,000 acres. That option in turn contained an express requirement that if Otter chose to exercise this option, Otter had to lease at least 10,000 of the 42,000 acres. Rather than obtain a mineral lease for itself, Otter assigned its option to Exxon, reserving to itself a specified portion of the bonus, rental, and royalty that Otter stood to receive had Otter itself taken a lease from Crosby.[3]

Paragraph [5] is the extension-and-renewal clause. The figure 42,000.98 in paragraph [1] is rounded off to 42,000 at all other junctures at which it appears in this opinion.

For the sake of clarity we note and correct minor errors in the version of the table appearing in paragraph [3][b] of the Letter Agreement. In particular, the figures in the "Acreage Selected" column do not describe contiguous intervals. Too, certain of those figures are mistakenly stated as dollar amounts rather than as numbers of acres. So corrected, the table reads as follows:

| Acreage Selected | Selection Bonus/Acre | Rental/Acre |
| --- | --- | --- |
| 10,000—15,000 | $90.00 | $45.00 |
| 15,001—20,000 | $80.00 | $45.00 |
| 20,001—25,000 | $75.00 | $45.00 |
| 25,000 | $70.00 | $45.00 |

Though no one in the proceedings below ever undertook to make this same correction expressly, it is clear from the transcript that the parties and the court treated the table appearing in the Letter Agreement as if it had read as we have set it forth here.

2. Their course of dealing also included a so-called "Supplemental Agreement" made between Crosby and Otter and dated December 20, 1983, which modified Exhibit "B" to the Geophysical Option Agreement. The Supplemental Agreement and the modification it effected in the Geophysical Option Agreement are not relevant to any aspect of the instant case other than the determination of damages and so its existence is otherwise disregarded here.

3. *See* paragraphs [3] and [4] of the Letter Agreement, set forth at n. 1, *supra.* Otter reserved to itself (i) the *excess* of the applicable selection bonus per acre provided in table [3][b] over $60.00; (ii) the *excess* of the applicable delay rental per acre provided in table [3][b] over $40.00; and (iii) a 2% of 8/8 overriding royalty on all acreage selected. The $60.00 and $40.00 figures appear in Exhibit "B" to the Geophysical Option Agreement, as modified by the Supplemental Agreement. Therefore, where the applicable selection bonus per acre and rental per acre are $90.00 and $45.00 respectively, as Otter contends, Otter's reservation operates to entitle Otter to $30.00 selection bonus per acre and

Exxon never exercised the option, and so the option expired on September 15, 1984, at the end of the 270–day period. Exxon subsequently took from Crosby an oil and gas lease covering only 4,387.08 acres [4] out of the same 42,000 acres to which the option had applied. Because that lease was made after the expiration of the option, paragraphs [3] and [4] of the Letter Agreement did not entitle Otter to a share of the bonus, rental, and royalty stemming from that lease. Exxon incurred obligations under those paragraphs only if it exercised the option.

Paragraph [5] of the Letter Agreement, however, contained an ordinary "extension-and-renewal" clause of the sort which is common in the oil and gas industry. The extension-and-renewal clause provided that if Exxon acquired a mineral lease on all or part of the 42,000 acres within one year after the expiration of the option, then Otter would be entitled to receive the same payments under paragraphs [3] and [4] as it would have had the option been exercised.

Without the extension-and-renewal clause, it would have been in both Exxon's and Crosby's economic interest for Exxon *not* to exercise the option. Instead, Exxon and Crosby would both be better off if Exxon could afford to wait and take a mineral lease after the expiration of the option. In that event, Exxon and Crosby could divide between them the monetary value that would have gone to Otter had the option been exercised. Exxon would pay bonus, rental, and royalty only to Crosby. To the extent of the overriding royalty benefits, the amount would be less than Exxon would have paid to Crosby and Otter together.

This course of action is commonly known in the oil and gas industry as a "washout" of the intermediary. Had a washout not been contractually precluded, Otter could not safely have undertaken to assign the option to Exxon.

$5.00 delay rental per acre, plus the overriding royalty.

**4.** This figure is rounded off to 4,387 at all other junctures at which it appears in this opinion.

Exxon of course did in fact trigger the extension-and-renewal clause by taking a mineral lease from Crosby within one year after the option expired. Exxon has acknowledged some obligation to Otter under the extension-and-renewal clause. It has recognized its obligation to pay—and has paid—to Otter a 2% of 8/8 overriding royalty on the 4,387 acres that it claims, pursuant to paragraph [4], constitute "all acreage selected." That overriding royalty is all that Exxon contends that it owes to Otter due to the operation of the extension-and-renewal clause. Otter, however, contends that the extension-and-renewal clause obligated Exxon to pay to Otter (i) a bonus of $30 per acre on all acreage leased, with a minimum of 10,000 acres to be leased; (ii) delay rentals, if any, of $5 per acre on a minimum of 10,000 acres to be leased; and (iii) a 2% of 8/8 overriding royalty on all acreage selected, with a minimum of 10,000 acres to be selected and leased [5].

The source of the divergence in their respective contentions is a dispute between Otter and Exxon as to (i) whether the 10,000–acre-minimum requirement in the option is included in the set of "obligations, duties, and rights" which the extension-and-renewal clause revives and makes applicable to Exxon, and (ii) whether paragraph [3] of the Letter Agreement requires payment of bonus and rental when fewer than 10,000 acres are leased. Exxon contended below that both questions should be answered in the negative, and so convinced the District Court. We reverse.

### Here's the "Beef"—But Where's the Agreement?

The extension-and-renewal clause said that if Exxon acquired a mineral lease on all or part of the 42,000 acres within one year after the expiration of the option, "then the obligations, duties and rights set forth *herein* shall apply to such extension, renewal or new lease" (emphasis added).

**5.** *See* n. 3, *supra.*

At trial, Exxon seized upon the word "herein" to argue that since the 10,000–acre-minimum requirement does not appear within the text of the Letter Agreement itself, that particular obligation or duty is not one which is set forth "herein", i.e., within the Letter Agreement. Therefore, contends Exxon, although the 10,000–acre-minimum requirement would have applied had Exxon exercised the option during the 270–day term of the option [6] and obtained at that time a mineral lease from Crosby, once the option had expired the extension-and-renewal clause was ineffective to revive the obligation to lease at least 10,000 acres. On this view, the 10,000–acre-minimum requirement did not apply at the time Exxon leased from Crosby and so Exxon was perfectly free to lease fewer acres, which it did. Finally, since the table [3][6] in the Letter Agreement doesn't provide for any bonus or rental to be paid when fewer than 10,000 acres are leased, Exxon contends, the "2% of 8/8 overriding royalty ... on *all acreage selected*" (emphasis added) set out in paragraph [4] of the Letter Agreement is therefore the only obligation Exxon now owes Otter. Since Exxon has paid and continues to pay that royalty to Otter on the 4,387 acres that Exxon selected and actually did lease from Crosby, Exxon reasons that it has no additional obligation to Otter and goes so far as to label Otter's appeal as "border[ing] on the frivolous."

### There's No Beef in Exxon's "Beef"

Exxon's set of contentions is problematic in two respects. First, by admitting that the 10,000–acre-minimum requirement would have applied had the option been exercised during its 270–day term,[7] Exxon implicitly admits that the obligations imposed by the Geophysical Option Agreement were substantially carried over into the Letter Agreement between Exxon and Otter. The concession was neither a regrettable slip of the lip nor the giving up of anything of value, given the presence of language in the Letter Agreement to the effect that "Exxon has agreed to comply with the terms and conditions of [the] Geophysical Option Agreement." Second, this admission destroys the only bulwark of Exxon's arguments against the next problem.

The purpose of the extension-and-renewal clause is to prevent a "washout," and the only way the clause can do so is if it puts Otter in as good a position as Otter otherwise would have been had Exxon not chosen to deal directly with Crosby within one year. Clearly, unless the 10,000–acre-minimum requirement is applied in calculating what is due to Otter from Exxon under the extension-and-renewal clause, Otter will not be put in such a position.

Undoubtedly, the parties' chosen method of drafting their contract by cobbling it together in piecemeal fashion has produced a result which is hardly a model of clarity. Even so, there is nothing tricky, exotic, or even unusual about the extension-and-renewal clause at issue here. Exxon knew or should have known the purpose of that clause, and cannot now rely upon the deficiencies of the process by which Exxon and Otter drafted their agreement to try to rationalize away the purpose of that extension-and-renewal clause.

### Agreement Sometimes Means Having to Say You're Sorry

Perhaps paradoxically, we agree with much of what Exxon said in its brief. Yes, a contract which is plain and unambiguous must be enforced by the court. La.Civ. Code Ann. art. 2046 (West 1987). Yes, the court cannot make a new contract for the parties or add obligations to the contract that were not a part of the original agreement between the parties. *Id.; see also Gordon v. Unity Life Ins. Co.,* 215 La. 25, 39 So.2d 812 (1949, reh. den. 1949). And

**6.** Exxon implicitly conceded this much at page 11 of its brief, when it stated "The [Letter] [A]greement provides that should Exxon exercise its option and acquire a lease from Crosby Chemicals, *i.e. lease at least 10,001* [sic] *acres* under the agreed terms ..." (emphasis added)

and again at page 12 when it stated "Exxon allowed its option to expire *because it did not find 10,001* [sic] *acres* which were worth leasing" (emphasis added).

**7.** *See* n. 6 *supra.*

yes, the Letter Agreement *is* unambiguous: it unambiguously adequately incorporates by reference the Geophysical Option Agreement. Therefore, the 10,000–acre-minimum requirement that appears in the Geophysical Option Agreement must be enforced by the court, and the court cannot make a new contract for Exxon. Exxon got that for which it bargained.

Yes, Otter is indeed attempting to restrict the freedom of Exxon and Crosby to deal with one another after the expiration of the option. Such a restriction, however, when reasonable in temporal and geographic scope and imposed upon or assumed by the parties for a valid commercial reason, is valid and enforceable. *Taylor Lumber Co., Inc. v. Fuller*, 292 So.2d 878 (La.App. 1974, reh. den. 1974, writ refused 1974); *Moorman & Givens v. Parkerson*, 131 La. 204, 59 So. 122 (1912, reh. den. 1912). After a one-year period—which period is not excessive—Exxon would have had as much freedom to deal with Crosby directly as it would have had had the Geophysical Option Agreement never existed.

Of course, we also disagree with several other assertions that Exxon makes. First, Exxon attempts to cast both the overriding royalty payments it currently is making to Otter and the bonus and delay rental payments which Otter seeks under the extension-and-renewal clause as some sort of windfall to Otter. Exxon reasons that since Otter made a profit in excess of $200,000 at the time that Otter first assigned the option to Exxon, whatever came Otter's way after that was pure "gravy." That contention is as illogical as Exxon's other contention to the effect that when Exxon allowed the option to expire, Exxon "sacrificed" its investment in the $766,000 purchase price of that option. Each company sought to maximize its profit and profitable potential on the transaction. In a market economy that quest is encouraged as long as certain constraints are respected. One of those constraints mandates complying with one's contractual obligations.

### The Denouement

Once we conclude that the Geophysical Option Agreement was adequately incorporated by reference into the Letter Agreement, Exxon's contention that the parties never contemplated a lease of fewer than 10,000 acres can be properly evaluated. Yes, the table [3][b] set out in the Letter Agreement is silent as to bonus and rental on a lease of fewer than 10,000 acres. The reason for that silence is that the parties did contemplate the possibility of a lease of fewer than 10,000 acres and they rejected it. *Both Otter and Exxon intended that Exxon obligate itself to lease at least 10,000 acres,* so there was no reason for them to address in the Letter Agreement the possibility of a lease of fewer than 10,000 acres. The parties intended that Exxon would pay a bonus of $90.00 per acre and a rental of $45.00 per acre on the first acre, the second acre, and every other acre up to and including the 10,000th acre that Exxon leased in accordance with the option. They did not provide a line in the table of the Letter Agreement that expressly referred to the bonus and rental applicable when fewer than 10,000 acres were selected because Exxon was obligating itself to lease at least 10,000 acres if it exercised the option at all.[8]

Had Exxon attempted to exercise the option during its 270–day term for fewer than 10,000 acres, the absence from the table of a line expressly referring to such a case certainly would not have precluded either calculation of, or award to Otter for its damages for Exxon's breach of its obligation to lease at least 10,000 acres. Similarly, the absence of such a line in that table does not preclude calculation of the

---

8. To have provided such a line in the table would have made only little more sense than treating the case of a lease of between 42,000 and, say, 75,000 acres in that table would have made. Indeed, since the last entry in that table refers to "25,000+" acres and not "25,000–42,000" acres, our conclusion that such a case was not included in that table—which clearly is correct—is based on reasoning very similar to that which we here employ to conclude that acres numbers 1 through 10,000 *were* included within the table in the Letter Agreement although not specified expressly therein.

damages due to Otter when the breach of the 10,000–acre-minimum requirement occurs during the one-year period covered by the extension-and-renewal clause.

We hold that the Letter Agreement adequately incorporated by reference the Geophysical Option Agreement, and that that incorporation included within its scope the 10,000–acre-minimum requirement specified in the Geophysical Option Agreement. The District Court should have construed the Letter Agreement in light of the Geophysical Option Agreement in its effort to ascertain the rights and duties of Otter and Exxon, each with respect to the other. It was error to do otherwise. Accordingly, we reverse and remand to the District Court for proper determination and award of Otter's damages.

REVERSED AND REMANDED.