UNITED STATES COURT OF APPEALS
For the Fifth Circuit

No. 99-60466

EXXON CORPORATION, A New Jersey Corporation,

Plaintiff-Appellant,

VERSUS

CROSBY-MISSISSIPPI RESOURCE, LTD., A Mississippi
Partnership; LYNN CROSBY GAMMILL, General Partner;
STEWART GAMMILL, III, General Partner; STEWART
GAMMILL, III, as Successor Trustee for Stewart,
Gammill IV, Trust No. 2; LUCIUS OLEN CROSBY GAMMILL,
Trust No. 2; JENNIFER LYNN GAMMILL, Trust No. 2; LUCIUS
OLEN CROSBY GAMMILL; STEWART GAMMILL, IV; JENNIFER LYNN
GAMMILL; STEWART GAMMILL, III, as Successor Trustee
for Stewart Gammill, IV; ALL DEFENDANTS,

Defendants-Appellees.

Appeal from the United States District Court
For the Southern District of Mississippi
(3:89-CV-627)

June 14, 2000

Before EMILIO M. GARZA, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM:[*]

Exxon Corporation (Exxon) appeals the district court's

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

decision granting summary judgment in favor of defendants Crosby-Mississippi Resource, Ltd., et al. (collectively, CMR). This factually complex oil and gas dispute has been pending for more than ten years. This Court previously considered an unrelated issue in a prior appeal. *See* **Exxon v. Crosby-Mississippi Resources, Ltd.**, 154 F.3d 202 (5th Cir. 1998). The single issue presented here is whether Exxon is obligated, by the terms of four separate joint operating agreements, to pay CMR a portion of a cost-free 3/16 royalty on some portion of the actual production from each of four individual oil wells covered by the four agreements. The district court granted summary judgment in favor of CMR on this issue, and then certified the issue for immediate appeal pursuant to Federal Rule of Civil Procedure 54(b). We affirm, as modified by this opinion, and remand for further proceedings.

I.

We are here asked to interpret the purportedly unambiguous terms of four substantively identical contracts between the parties, Exxon and CMR, and several non-parties, Prosper Energy Corporation, Petro-Hunt Corporation, and Propel Energy Company (collectively referred to as Prosper). Our review is de novo, *see* **Musser Davis Land Co. v. Union Pacific Resources**, 201 F.3d 561, 563 (5th Cir. 2000), and the parties agree that the controlling issues

2

are governed by Mississippi state law. Exxon claims that the district court erred because the unambiguous terms of the contract require the conclusion that CMR is entitled only to its cost-bearing working interest on production, and not to any additional monies in the form of a cost-free royalty on production. Alternatively, Exxon claims that, even if CMR is entitled to a royalty, Exxon is entitled to a similar and presumably offsetting royalty. Finally, Exxon maintains that, even if CMR alone is entitled to a royalty, the district court miscalculated Exxon's proportionate share of that royalty, thus diluting Exxon's cost-bearing working interest in production under the four contracts. CMR defends the district court's judgment rejecting each of these arguments. The parties agree that the resolution of this case depends entirely upon the express terms of these four contracts, referred to herein as the joint operating agreements or JOAs, and not upon the terms of any other agreements. We will therefore begin with an analysis of the relevant contract provisions.

## II.

The four JOAs contain identical contract terms, aside from contract specific information identifying the lands, specifying the percentage of each parties' working interest, and providing certain effective dates. There are several exhibits to each of the four JOAs, two of which are relevant to the issue presented. Exhibit A identifies the contract area covered by the particular JOA and

3

purports to define the parties "working interests" in the contract area. Exhibit B is a form oil, gas, and mineral lease, which provides for the payment of a 3/16 royalty.

Each JOA states that the parties have "reached an agreement to explore and develop these leases and/or oil and gas interests for the production of oil and gas." The "Definitions" section of the agreement provides, in relevant part:

* * *

B.   The terms "oil and gas lease," "lease," and "leasehold" shall mean the oil and gas leases covering tracts of land lying within the Contract area that are owned by the parties to this agreement.

C.   The terms "oil and gas interests" shall mean unleased fee and mineral interests in tracts of land lying within the Contract area that are owned by the parties to this agreement.

* * *

G.   The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

H.   The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

The "Exhibits" section of each JOA provides that the exhibits are incorporated by reference. That section further provides, in relevant part, that:

> If any provision of any exhibit, except Exhibits "E" and "A" is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall

4

prevail.

Article III is titled "Interests of Parties," and contains four subparts; subpart A titled "Oil and Gas Interests," subpart B titled "Interests of Parties in Costs and Production," subpart C titled "Excess Royalties, Overriding Royalties and Other Payments," and subpart D titled "Subsequently Created interests."  Article III provides, in relevant part:

A.    Oil and Gas Interests:

    If any party owns an oil and gas interest in the Contract Area, the interest shall be treated for all purposes of the agreement and during the term hereof as if it were covered by the form of oil and gas lease attached hereto as Exhibit "B" and the owner thereof shall be deemed to own both the royalty interest reserved in such lease and the interest of the lessee thereunder.

B.    Interests of Parties in Costs and Production:

    Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A".  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of 3/16 which shall be borne as hereunder set forth.

    Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated herein above and shall hold the other parties free from any liability therefor. No party shall ever be responsible, however, on a price basis higher than the price received by such party, (or any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner shall demand and receive

5

> settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price.
>
> Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby.

Thus, each JOA expressly provides for the payment of a 3/16 royalty in at least two circumstances. First, such a royalty is due to a party to the joint operating agreement whenever that party also owns unleased mineral interests in the contract area. Article III subpart A provides that any party to the JOA, i.e. Exxon, CMR, or Prosper, that also owns an "oil and gas interest in the contract area," shall own "both the royalty interest reserved" in the lease attached to the JOA as Exhibit B and the "interest of the lessee thereunder," which is a cost-bearing working interest in production. *See* 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW, MANUAL OF OIL AND GAS TERMS, at 566, 1193 (1999). Each JOA defines the term "oil and gas interests" to mean "unleased fee and mineral interests . . . which are owned by the parties to this agreement." Further, the "royalty interest reserved" in the lease attached as Exhibit B is a cost-free 3/16 royalty on production. Thus, Article III subpart A, together with the lease attached as Exhibit B, provides that any party to the JOA, which also owns an unleased mineral interest in the contract area, is entitled to a 3/16 cost-free royalty on production (to the extent of that party's unleased mineral interest and subject to the terms of the lease attached as

6

Exhibit B) in addition to that party's working interest under the JOA.

Second, Article III subpart B recognizes that a 3/16 royalty may be also be due to a third party, which is not a party to the JOA, such as the lessor of an oil and gas interest that was leased to one of the signing parties before the particular JOA was signed. Article III subpart B also addresses how any 3/16 royalty to be paid, whether owed to a party pursuant to subpart A or to a non-party pursuant to subpart B, is to be paid by the parties to the JOA. Subpart B states that any royalty or other obligation not exceeding 3/16 of production will be paid by the parties "to the extent of" or in a manner proportionate to their working interest in production from the contract area. Subparts C and D essentially provide that any royalties or other obligations that are in excess of the 3/16 royalty described in subpart B or that constitute subsequently created or undisclosed interests will not be shared proportionate to ownership among the parties, but will remain the sole obligation of the party currently burdened by the obligation.

Exhibit A describes the contract area, provides the names and addresses of all parties for notice purposes, and most significantly, defines the cost-bearing "working interests" of the parties. Exhibit A provides, in relevant part:

3. <u>Working Interests of Parties:</u>

In determining the interests of the parties hereto, Prosper, Propel and Petro-Hunt shall first be considered to be one party; and, similarly, Exxon and CMR, ET AL

7

shall first be considered to be one party

PROSPER, PETRO-HUNT AND PROPEL     EXXON AND CMR, ET AL

    39.24%                              48.26%

If it should be subsequently discovered that the interest(s) of either Prosper, Propel and Petro-Hunt or Exxon and CMR et al is incorrect, the interest(s) of the parties in the Contract Area shall be retroactively adjusted to reflect the corrected interest in the same manner as the interest was calculated above. Each signatory hereto shall alone bear any additional burden other than that provided in Article III hereof including but not limited to conversion options and all farm in and other obligations.

As among Exxon and CMR et al, the working interests in the Contract Area provided for above, shall be divided as follows:

EXXON CORPORATION    CROSBY-MISSISSIPPI RESOURCES, LTD

76.00000%                        24.00000%

The quoted percentages are drawn from one of the JOAs. The specific percentage of Exxon and CMR's combined working interest as compared to Prosper's, i.e. the figures in the first line of percentages, varies by contract. The way in which Exxon's and CMR's individual interest in the combined working interest is divided, however, remains constant, with Exxon owning 76% of the combined working interest and CMR owning 24% of the combined working interest. Exxon's and CMR's individual working interest is obtained by multiplying the combined working interest for a particular JOA by the percentage of the combined working interest which is owned by each of the parties. For example, the JOA quoted above covers all of Section 26, Township 2 South, Range 17 West in

8

Pearl River County, on which has been drilled the So. Minerals No. 26-10 oil well. In that well, Exxon owns a 36.6776 percent cost-bearing working interest in production (calculated as 76 percent of the 48.26 percent combined working interest), CMR owns an 11.5824 percent cost-bearing working interest in production (calculated as 24 percent of the 48.26 combined working interest), and Prosper owns a 39.24 percent cost-bearing working interest in production.[2]

As set forth above, Article III subpart B provides that each party's royalty burden is to be determined with reference to and paid proportionate to its working interest in the contract area. Thus, for the JOA quoted above, Exxon is responsible for 36.6776 percent of any royalty due, whether to a party owning an unleased

_____

[2] The remaining JOAs likewise define the parties' respective working interests in Exhibit A to the contracts. Under a JOA covering all of Section 2, Township 3 South, Range 17 West, on which has been drilled the Leo Flynt 2-7 oil well, Exxon owns a 25.22754 percent working interest in production (calculated as 76 percent of a 33.19413 percent combined working interest), CMR owns a 7.96659 percent working interest in production (calculated as 24 percent of a 33.19413 percent combined working interest), and Prosper owns a 21.79688 percent working interest. Under a JOA covering all of Section 10, Township 2 South, Range 17 West, on which has been drilled the So. Minerals No. 10-10 oil well, Exxon owns a 16.01768 percent working interest (calculated as 76 percent of a 21.0759 percent combined working interest), CMR owns a 5.05822 percent working interest (calculated as 24 percent of a 21.0759 percent combined working interest), and Prosper owns a 76.92410 percent working interest. Finally, under a JOA covering all of Section 35, Township 2 South, Range 17 West, on which has been drilled the So. Minerals No. 35-1 oil well, Exxon owns a 35.45025 percent working interest in production (calculated as 76 percent of the 46.64506 percent combined working interest), CMR owns a 11.19481 percent working interest in production (calculated as 24 percent of the 46.64506 percent combined working interest), and Propser owns a 40.17785 percent working interest.

9

mineral interest or to a third party lessor or obligor, CMR is responsible for 11.5824 percent of any such royalties, and Prosper is responsible for 39.24 percent of any such royalties. Having set forth the relevant contract terms, we now turn to consideration of the specific arguments of the parties.

III.

Exxon argues that the district court erred by holding that the unambiguous terms of the four JOAs provide that CMR is entitled to a cost-free 3/16 royalty on production, in addition to CMR's working interest as defined in Exhibit A to each JOA. Exxon argues that, contrary to the district court's conclusion, Exhibit A defines the parties' total interest under each of the contracts, rather than their cost-bearing working interest. This contention, which Exxon raises in a variety of ways, is belied by the plain language of Exhibit A, which refers exclusively to the "working interests" of the parties.

Exxon responds that the term "working interests" in this context was intended to refer to something Exxon has labeled the parties' "gross working interests." Thus, Exxon maintains that no party can ever be entitled to more from the well than the percentage set forth in Exhibit A. Exxon essentially argues that a joint operating agreement cannot provide for the same party to own both a cost-free royalty interest in subsequent production, if any, and a cost-bearing working interest in the same well.

10

Once again, this contention is belied by the plain terms of the contracts. There is no language in any section of the JOAs suggesting that the parties intended anything other than that the terms "royalty interest" and "working interest" would have the ordinary and well-established meaning given to those terms in oil field contracts. A working interest is a cost-bearing interest in production, generally created by an oil and gas lease. *See* 8 Howard R. Williams & Charles J. Meyers, Oil and Gas Law, Manual of Oil and Gas Terms, at 566, 1193 (1999); *see also id*. at 952. The term "gross working interest," in contrast, has a very particular and specialized meaning, derived in large part from the context of Department of Energy reporting. *See id*. at 474. There is simply no indication that the parties intended to employ that term, rather than the plain and unambiguous language used, in this contract. Moreover, and contrary to Exxon's suggestion, there is no indication that the ownership of a working interest is inherently preclusive of any other interest in the well. To the extent that a contract reserving both a royalty interest and a working interest in favor of the same party may be atypical, that does not give us the authority to avoid an unambiguously worded contract by rewriting the agreement for the parties. *See Otter Oil Co. v. Exxon Co., U.S.A.*, 834 F.2d 531, 534 (5th Cir. 1987); *see also Robin v. Sun Oil Co.*, 548 F.2d 554 (5th Cir. 1977).

In a related argument, Exxon contends that Exhibit A reflects

11

Exxon's and CMR's agreement to pool their interests without differentiating between them, such that Exxon owns 76 percent of the combined interests and CMR owns 24 percent of the combined interests. Thus, Exxon argues, there is no difference between Exxon and CMR with respect to the combined interests, and the fact that CMR contributed unleased mineral interests while Exxon contributed leases is of no moment. Exxon concludes that Exxon bargained for and owns the precise and unencumbered percentage of gross working interest set forth in Exhibit A to each JOA.

This argument must fail for similar reasons; that is, because it is premised upon the theory that Exhibit A both defines something more than an ordinary working interest and simultaneously precludes any other interest by the parties. Exhibit A defines the parties' working interests. As to those interests, we agree with Exxon that the JOAs arguably reflect an agreement not to treat Exxon's and CMR's interests differently.[3] With respect to royalty,

_____

[3] On the other hand, we note that even Exhibit A provides for a division of the combined working interests of Exxon and CMR, while not similarly providing for such a division between the various entities collectively referred to herein as Prosper. Exxon's argument that the JOAs reflect an intent not to differentiate between Exxon's and CMR's interests in any manner might be stronger if Exxon and CMR had entered into the JOAs as a single entity contributing a single block of undifferentiated oil and gas interests. But each of the parties signed the agreements in their individual capacity. Exhibit A provides for a division of the parties' combined working interests. Finally, and most significantly, Exxon has neither disputed that CMR continues to own unleased mineral interests within the contract areas defined by the individual JOAs nor clearly alleged that it owns some undivided portion of such interests itself. Absent such an allegation, the district court did not abuse its discretion by refusing to allow

12

however, the JOAs unambiguously provide that the owners of unleased mineral interests are entitled to a royalty interest, in addition to whatever working interest is retained by the parties.

Exxon acknowledges the separate provision in Article III subpart A of the JOAs providing for a 3/16 royalty interest to parties, but argues that the provision is inapplicable for several reasons. Exxon first maintains that there is an inherent inconsistency between Article III subpart A and Exhibit A because the payment of a royalty under the first provision is inconsistent with its theory that the second provision defines the parties' total interest under the contract. Exxon then relies upon the Exhibits section of the JOAs for the proposition that, in the case of a conflict, Exhibit A should be given controlling effect. The problem with this argument is that it once more depends upon Exxon's theory that Exhibit A defines the parties' total interest. Given that we have already rejected that theory, there simply is no conflict requiring the supremacy of Exhibit A.

Exxon next maintains that non-consenting parties, i.e. parties which are not participating in the production by bearing their proportionate share of costs and expenses, are entitled to the royalty specified in Article III of the JOAs, but that consenting parties, i.e. parties which have a defined interest under Exhibit A, are not. There is no dispute about the fact that CMR was a

_____

Exxon to amend its pleadings to include such a claim.

13

consenting party with respect to each of the four wells covered by the JOAs.  The problem with this argument is that Article III subpart A simply does not distinguish between consenting and non-consenting interests or parties in any way.  To the contrary, Article III subpart A is expressly provides that a royalty is due when "any party owns an oil and gas interest."  Exxon's interpretation requires that we insert a significant word of limitation by revising the provision to read that a royalty is due only when "any [non-consenting] party owns an oil and gas interest."  Neither the plain language of the applicable provision nor any other language in the JOAs suggests that the parties merely omitted this significant limitation when executing Article III subpart A.  The words as written are clear, and provide for the payment of a royalty to any party which also owns an unleased mineral interest in the contract area, without regard to whether that party is also participating in production as a consenting party.

Finally, Exxon points out that the royalty provision states that parties owning an oil and gas interest "shall be treated for all purposes of this agreement" as if the interest were covered by the lease attached as Exhibit B.  Exxon then argues that providing a consenting party with a royalty interest is not one of the "purposes" of the JOA.  To establish this point, Exxon relies upon affidavit testimony that was not taken into consideration by the district court.  Even if we were inclined to consider anything

14

other than the plain terms of the contracts between the parties, Exxon's argument in this regard must fail. First of all, the quoted phrase is plainly not intended to limit or define the purposes of the JOA in any way, but merely to explain that the royalty interest forms part of the rights and obligations created by the JOA. More importantly, Exxon's affidavit testimony is offered to contradict the plain and unambiguous terms of the contract. Contrary to Exxon's argument, Mississippi law would not permit the admission of such evidence to contradict the plain terms of an unambiguous contract. *See* ***Estate of Parker v. Dorchak***, 673 So.2d 1379, 1381 (Miss. 1996); ***Ross v. Brasell***, 511 So.2d 492, 494 (Miss. 1987).

In sum, we cannot accept Exxon's argument that Exhibit A serves as the sole source of the parties' interests without ignoring the plain language of Exhibit A and deleting Article III subpart A, which has no purpose other than to provide for the payment of a royalty to parties signing the JOA, out of the contract. This we cannot do. *See*, *e.g.*, ***Aetna Cas. & Sur. Co. v. Head***, 240 So.2d 280, 282-82 (Miss. 1970). Similarly, we cannot accept Exxon's argument that Article III subpart A benefits only non-consenting parties without writing that significant word of limitation into the contract. This, we likewise cannot do. *See*, *e.g.*, ***Glantz Contracting Co. v. General Elec. Co.,*** 379 So.2d 912, 916 (Miss. 1980) ("Courts do not have the power to make contracts

15

where none exist, nor to modify, add to, or subtract from the terms of one in existence." (internal quotations omitted)).  For these reasons, we conclude that the district court correctly held that the terms of the four JOAs unambiguously call for the payment of a 3/16 cost-free royalty to CMR.  That royalty is due, not upon all production, but only to the extent that CMR can establish that it owns unleased mineral interests in the contract area.  We now turn to the issue of how that royalty burden is to be divided among the parties to the JOAs.

IV.

In its final point, Exxon maintains that the district court miscalculated its proportionate share of the royalty due CMR as an unleased mineral interest owner by holding Exxon responsible for 76 percent of any such royalty due.  While the district court's writing on this point is not exceptionally clear, we agree with Exxon that the district court's decision can be construed to hold Exxon responsible for 76 percent of the royalty due CMR under the JOAs.  We likewise agree that such a construction would be error. The  JOAs clearly provide that each party bears the burden of paying any royalty due under Article III, provided that royalty does not exceed 3/16, only "to the extent of its interest in such production."  Thus, Exxon's proportionate share of the royalty obligation to CMR can never exceed the percentage corresponding to

16

its individual (as opposed to combined) working interest under the particular JOA. For example, under the JOA quoted in Section II, Exxon's proportionate share of any royalty obligation to CMR for the So. Minerals No. 26-10 well cannot exceed 36.6776 percent of the total royalty obligation to CMR.

To the extent that the district court held Exxon responsible for 76 percent of the royalty obligation to CMR, the error appears to be mathematical. The allocation of Exxon's and CMR's combined working interest between those two parties is 76 percent to Exxon and 24 percent to CMR. The district court employed that allocation to reach its apparent conclusion that Exxon must pay 76 percent of any royalty due. If Exxon's proportionate share of the royalty obligation is calculated with reference exclusively to those figures, however, with Exxon responsible for 76 percent of the royalty burden and CMR responsible for the remaining 24 percent of the royalty burden, then the entire burden will be paid by those parties with none of the royalty burden being allocated to the remaining parties to the contract, those entities collectively referred to as Prosper.[4] The proper analysis would hold Exxon responsible for 76 percent of the royalty owed by *both* Exxon and

---

[4] Although the fact should be obvious from our analysis, we pause to note for clarification purposes that CMR itself, as a party signing the JOAs, is likewise obligated to pay a portion of the 3/16 royalty owed to unleased mineral interest owners. Stated differently, CMR's own working interest, as defined in Exhibit A to each JOA, is burdened by the obligation to pay a percentage of whatever 3/16 royalty is due, even if that royalty is owed to CMR itself.

17

CMR on the basis of their *combined* working interest. For example, using the JOA quoted in Section II above, Exxon would be responsible for 76 percent (Exxon's share of Exxon and CMR's combined working interest) of 48.26 percent (Exxon and CMR's combined working interest in the JOA covering So. Minerals No. 26-10), or 36.6776 percent, of whatever sum comprises the 3/16 royalty due.

For the foregoing reasons, we modify the district court's judgment by clarifying that Exxon's proportionate share of the obligation to pay CMR a royalty under Article III of the JOAs may not exceed Exxon's actual and individual working interest in the contract area.


**CONCLUSION**

The decision of the district court granting CMR summary judgment is AFFIRMED AS MODIFIED to clarify that Exxon's proportionate share of any royalty due CMR as an unleased mineral interest owner is limited to that percentage of the total burden which corresponds to Exxon's individual working interest under the applicable JOA. The district court is in all other respects AFFIRMED. The extent to which CMR owns an unleased mineral interest, and therefore the precise royalty obligations of Exxon and CMR, are matters of proof which are beyond both the issue presented to this Court for appeal and the competence of the

existing record.  We therefore REMAND to the district court for further proceedings consistent with this opinion.